[Cite as *State v. Engler*, 2021-Ohio-902.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO. 2020-L-055** |
| COLLIN F. ENGLER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas.
Case No. 2018 CR 000472.

Judgments: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Jennifer A. McGee*, Assistant Prosecutor, Lake County Administration Building, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Hector G. Martinez, Jr.* and *Leslie S. Johns*, 4230 State Route 306, Suite 240, Willoughby, OH 44094 (For Defendant-Appellant).

MARY JANE TRAPP, P.J.

{¶1} Appellant, Collin Engler ("Mr. Engler"), appeals from the judgments of the Lake County Court of Common Pleas, which denied his motion to suppress and sentenced him after a no contest plea to aggravated vehicular homicide and operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them ("OVI"). Mr. Engler's convictions stems from a motorcycle crash, in which his passenger and

partner tragically died. Mr. Engler was later found to be driving while intoxicated at the time with a blood alcohol concentration ("BAC") of .158.

{¶2} Mr. Engler raises three assignments of error for review. He first contends that the trial court erred by denying his motion to suppress the breath test result because the state failed to substantially comply with the Ohio Department of Health Drug and Alcohol Testing ("ODHDAT") regulations governing the Intoxilyzer 8000 that was used to administer Mr. Engler's test. He secondly contends that his sentence is contrary to law because the trial court sentenced him to a maximum term of imprisonment of eight years on the aggravated vehicular homicide charge without consideration of R.C. 2929.11 and R.C. 2929.12 and without making maximum sentence findings pursuant to R.C. 2929.14(C). Lastly, Mr. Engler contends the trial court abused its discretion in sentencing him to the maximum sentence of 180-days in jail for the OVI because it did not consider the misdemeanor purposes and facts related to misdemeanor sentences pursuant to R.C. 2929.21 and R.C. 2929.22 and that this was his first OVI offense.

{¶3} After a review of the record and pertinent law, we find Mr. Engler's contentions to be without merit.

{¶4} Firstly, Mr. Engler did not show that the Intoxilzyer 8000 instrument at the Eastlake Police Department was not properly certified or in working order at the time of his test. The state met its burden of showing substantial compliance, and Mr. Engler failed to demonstrate any prejudice.

{¶5} Secondly, the Supreme Court of Ohio in *State v. Jones*, --- Ohio St.3d ---, 2020-Ohio-6729, --- N.E.3d ---, made clear that "[n]othing in R.C. 2953.08(G)(2) permits an appellate court to independently weigh the evidence in the record and substitute its

2

judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *Id.* at ¶ 42. Further, the trial court is no longer required to make maximum sentence findings pursuant to R.C. 2929.14(C). *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, ¶ 62-64. Even if the failure to consider the purposes and principles pursuant to R.C. 2929.11 and the factors pursuant to 2929.12 were subject to appeal under R.C. 2953.08(G)(2), there is no indication that the trial court did not consider the statutory requirements or that Mr. Engler's sentence is contrary to law.

{¶6} Thirdly, there is nothing to indicate the trial court erred in imposing the 180-day maximum sentence for the OVI. There is no requirement in misdemeanor sentencing for the trial court to state on the record that it considered the statutory sentencing criteria. Further, a review of the sentencing hearing reveals the trial court comprehensively considered the relevant statutory requirements in light of the facts of this case where the victim tragically lost her life.

{¶7} The judgments of the Lake County Court of Common Pleas are affirmed.

### Substantive and Procedural History

{¶8} On April 21, 2019, the Eastlake Police Department was dispatched to the corner of Vine Street and E. 359 Street for a "motorcycle car accident with injury." When they arrived on the scene, a woman, later identified as Abbigayl Forman ("Ms. Forman"), was lying in the intersection with a large amount of blood pooling around the left side of her head. A bystander, who also happened to be a nurse, was holding Ms. Foreman's head back so she could breathe, as was she was taking slow, gasping breaths. Ms. Forman was transported by emergency life flight but was later pronounced brain dead at the hospital.

3

{¶9} Mr. Engler identified himself as the one who was driving the motorcycle and as Ms. Forman's boyfriend. He told the officer that a car had cut him off but that the two vehicles did not make contact. The officers could detect a strong odor of alcohol emanating from Mr. Engler's person. Mr. Engler stated that he was just coming from work and that they were going to meet friends. His speech was slurred, but he denied having anything to drink. Mr. Engler declined medical treatment and had no visible injuries to his face or head.

{¶10} The police officer advised Mr. Engler that he was under arrest for OVI and transported him to the station. Mr. Engler was observed for 20 minutes prior to a breath test to ensure he had nothing in his mouth. He consented to the test after he was read the 2255 implied consent form. The breath test, which was taken on the Intoxilyzer 8000, measured a BAC of .158, almost twice the legal limit of .08.

{¶11} Mr. Engler was subsequently indicted on eight counts: (1) OVI, a first-degree misdemeanor, in violation of R.C. 4511.19(A)(1)(a); (2) OVI, a first-degree misdemeanor, in violation of R.C. 4511.19(A)(1)(d); (3) aggravated vehicular homicide, a second-degree felony, in violation of R.C. 2903.06(A)(1)(a); (4) aggravated vehicular homicide, a second-degree felony, in violation of R.C. 2903.06(A)(1)(d); (5) aggravated vehicular homicide, a third-degree felony, in violation of R.C. 2903.06(A)(2); and (6), (7), & (8)involuntary manslaughter, a third-degree felony, in violation of R.C. 2903.04(B).

### Motion to Suppress Breath Test

{¶12} Mr. Engler initially pleaded not guilty, and as is pertinent to this appeal, filed a motion to suppress breath test/motion in limine. Mr. Engler argued that: the state failed to substantially comply with the rules and procedures adopted by ODHDAT in

4

administering the Intoxilyzer 8000 in Ohio; the machines are scientifically unreliable and produce inaccurate results; and the machine specifically used for Mr. Engler's April 21, 2018 breath test was not in proper working order or properly maintained. Thus, Mr. Engler's test should be suppressed.

{¶13} Mr. Engler did not assert a general challenge to the reliability of the Intoxilyzer 8000.

{¶14} The court held a two-day hearing in which the state presented the evidence and testimony of four witnesses.

{¶15} Jeanna Walock ("Ms. Walock"), a forensic toxicologist and program administrator for the ODHDAT Program, testified as to the training, program, and procedures for OVI testing in the state of Ohio. She explained that the Intoxilyzer 8000 is one of three instruments that are approved for evidential breath alcohol testing in the state of Ohio; that ODHDAT trains the operators of the instruments; and that it conducts annual certifications, as well as maintenance and repairs of the machines. An annual certification is specifically required by the Ohio Administrative Code for each Intoxilyzer 8000. In addition, a certification must also be done if the dry gas standard changes.

{¶16} Ms. Walock also explained Ohio's computerized online breath archives data, also known as "COBRA data," which consists of information electronically transmitted by the Intoxilyzer 8000 machines throughout the state to ODHDAT for each breath test performed, as well as any certifications, diagnostics, calibration checks, and any records on the instruments. ODHDAT is required to keep these records for three years, but, in fact, it has records going back to the in-service inception of each machine. Ms. Walock testified that she is responsible for maintaining the instrument records, and

she produced all the data available on COBRA of the specific Intoxilyzer 8000 (serial number 80-004678) machine used to conduct Mr. Engler's breath test at the Eastlake Police Department, as well as "every record received" or "captured" from this particular machine.

{¶17} She explained that during a breath test, the Intoxilyzer 8000 takes two breath samples with a waiting period in between. The lower sample reading is used as the subject's BAC. The operator has the responsibility to observe the test subject for not less than twenty minutes to ensure that the subject has not eaten or drunk anything so that the test subject is protected from any residual alcohol in the mouth, which may contribute to or affect the breath test. An accuracy check is performed at the beginning and at the end of every breath test. The machine will automatically abort the test if an exception occurs, such as too much ethanol in the environment or radio frequency interference ("RFI"). The ethanol level must be plus or minus 0.0005 grams per 210 liters of the target concentration. At the conclusion of the test, the instrument prints out the data. At some point, ODHDAT connects to the machine and downloads the data into the COBRA database.

{¶18} Per the Ohio Administrative Code, when the state is performing control checks during subject testing and/or certification of the instrument, it must use dry gas control that is traceable to the National Institute of Standards and Technology ("NIST"). She explained that at the dry gas control measurement steps of the breath test, there is an "acceptance window" or "tolerance window" for that standard of plus or minus 0.005 grams per 210 liters, so that measurements between 0.095 grams per 210 liters and 0.105 grams per 210 liters are acceptable. A reading outside of that range will cause the test

to abort because the instrument is designed to not complete a test if the standards are out of range.

{¶19} Regarding the traceability of the dry gas control that was used in Eastlake's machine, Ms. Walock testified regarding the Certificate of Analysis, which she identified and which was admitted into evidence.

{¶20} The "Traceability" section of the Certificate of Analysis reads: "Gas mixture manufactured with balances calibrated by an ISO 17025 accredited company using NIST traceable weights and meet or exceeds the requirements of NIST Handbook. 44." The certificate also contains the following note: "NMI is recognized by NIST through the Mutual Recognition Agreement (CIPM MRA)."

{¶21} She explained that the certificate "provides an unbroken chain of traceability back to NIST standards." The "preparations" paragraph states that "under traceability for the standard that was used in this instrument references the calibration tests that were done using NIST traceable weights to document that the balance used to manufacturer [sic] the standard was calibrated properly and in compliance."

{¶22} Ms. Walock walked through each step in the report of Mr. Engler's test, including the results of each breath sample attempt and each dry gas control. There were no "exceptions" reported in the data from Mr. Engler's test.

{¶23} Gregory Marquis ("Mr. Marquis"), an infrastructure specialist II for ODHDAT, collects data for the Intoxilyzer 8000 and assists inspectors, officers, and troopers with any issues that might arise with the instrument. Mr. Marquis explained that the Eastlake Police Department contacted him when they were having a possible issue with the Intoxilyzer 8000 in early February. He downloaded the data from the instrument on

7

February 8, 2018. He filled out the instrument issues log and noted the service as due to "instrument issues." Mr. Marquis explained that is the entry used to document a routine download of the record to clear out the machine's memory. The finding was further noted as "dry gas out of tolerance" and "resolution: replaced instrument."

{¶24} In response, he connected with the instrument through the COBRA application and ran a series of dry gas calibration checks. The dry gas tolerance standard for the Intoxilyzer 8000 requires the dry gas to test at .100 with a deviation of plus or minus .005. The dry gas calibration check ran three tests, and all three results were 0.105, which was within the upper bounds of the tolerance standard range. Mr. Marquis explained that this means "[t]he machine is in good working order, but just proactively, I contacted the inspector to say that this instrument should be on his watch list to replace if it does go out of tolerance, high, with like a 0.106 value, that we would have to replace the instrument. They would not be able to perform any future tests." Mr. Marquis clarified that "resolution: replace instrument" means "in the future, if it does go out of tolerance, it has to be replaced." At the time, however, the machine was found to be in "good working order."

{¶25} Inspector Craig Yanni, ("Insp. Yanni"), who also works for ODHDAT, specializes in installing, certifying, and removing Intoxilyzer 8000s machines when they have problems. He also trains operators and renews their permits for the instrument. Insp. Yanni testified that he certified that the Eastlake Intoxilyzer 8000 was in proper working order on February 26, 2018.

{¶26} The certification process involves five breath tests – unlike an actual breath test, which takes two tests. The result of the tests of the Eastlake machine were .105,

8

.100, .101, .100, .101, which were all within the .100 tolerance standard with a .005 deviation. Insp. Yanni stated the .100 dry gas sample that was used for the certification showed that it was prepared using NIST standards and that it was also traceable to NMI ("National Metrology Institute") standards.

{¶27} Following the certification process of an Intoxilyzer 8000, a certificate is issued, which states that a diagnostic was run on the instrument and that the instrument and its internal components are working properly. At the very end, the certifier notates that the instrument "remains in service" and signs the certificate. In addition to the dry gas tolerance test, the certifier also performs a wet bath simulator test and checks for RFI.

{¶28} During his testimony, Insp. Yanni reviewed a printout of Mr. Engler's April 21, 2018 breath test. First, a dry gas control check was run, which resulted in a first subject sample of .104 (within the tolerance range of 0.100). Mr. Engler then tested for .164 ethanol on his first test and .158 on his second. A second subject sample tested at .105. The test then recorded the lower of Mr. Engler's two results, which was .158. Insp. Yanni opined that based on the printout of Mr. Engler's breath test results, the machine was operating properly.

{¶29} As far as other previous services on the specific instrument at issue, Insp. Yanni conducted an RFI check on the instrument almost a month before Mr. Engler's test, on March 21, 2018. The record of the service, however, was not documented on the instrument issues log, and he could not recall why he had gone back to test the machine. The record is silent as to whether these types of RFI checks are routinely entered into the instrument issues log.

9

{¶30} Lastly, Sergeant Kenneth Roberts, Jr. ("Sgt. Roberts"), the operator of Mr. Engler's breath test, testified that he, along with another officer, read Mr. Engler a copy of the 2255 implied consent form for breath tests. Mr. Engler opted to take the Intoxilyzer 8000 breath test. He observed Mr. Engler for twenty minutes to ensure he did not have or take any substance in his mouth prior to administering the test. Mr. Engler was able to complete the test, and a report was issued.

{¶31} The trial court denied Mr. Engler's motion to suppress. In its lengthy judgment entry, the court noted that Intoxilyzer 8000 machines are approved for use as evidential breath testing equipment, pursuant to Ohio Adm.Code 3701-53-02(A). Therefore, as long as the results from them are analyzed in accordance with the guidelines established by the Ohio Department of Health ("ODH"), defendants may not attack their general scientific reliability. The court found that contrary to Mr. Engler's claims, the Intoxilyzer 8000 machine used to test him was properly calibrated, maintained, and in working order on the day of the accident at issue. The instrument was properly certified as required by the Ohio Administrative Code and fully operational; the officer was trained in the machine's use and substantially complied with the rules and regulations regarding such testing.

{¶32} The trial court further found that the specific claims that Mr. Engler raised lacked merit, i.e., that the Intoxilyzer 8000 was marked to be replaced; records were not maintained; Sgt. Roberts used manual prompts instead of the instrument's prompts; Sgt. Roberts gave an improper implied consent advisement; and the dry gas standard was not traceable to NIST. The court concluded that the state substantially complied with all of

10

the requirements of the Administrative Code, and Mr. Engler did not demonstrate that he would be prejudiced by anything less than technical compliance.

*Sentencing*

{¶33} Mr. Engler entered a plea of no contest to all eight counts. For sentencing purposes, the court found that count 2 (OVI) merged with count 1 (OVI) and that count 4 (aggravated vehicular homicide), count 5 (aggravated vehicular homicide), count 6 (involuntary manslaughter), count 7 (involuntary manslaughter), count 8 (involuntary manslaughter) merged with count 3 (aggravated vehicular homicide).

{¶34} The court imposed a six-month prison term as to OVI, to run concurrent to an eight-year prison term as to aggravated vehicular homicide.

{¶35} Mr. Engler raises three assignments of error on appeal:

{¶36} "[1.] The trial court erred to the prejudice of appellant by denying his motion to suppress the breath test result.

{¶37} "[2.] The trial court erred by sentencing appellant to a maximum term of imprisonment of eight years on the aggravated vehicular homicide charge, when that sentence was contrary to law.

{¶38} "[3.] The trial court committed an abuse of discretion when it imposed a maximum sentence of 180-days in jail for the first offense OVI charge."

**Motion to Suppress Standard of Review**

{¶39} When reviewing a motion to suppress, this court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Kirtland Hills v. Fuhrman*, 11th Dist. Lake No. 2007-L-151, 2008-Ohio-2123, ¶ 8. "'Accepting those facts as true, we must independently determine as a matter of law, without deference to the

11

trial court's conclusion, whether they meet the applicable legal standard.'" *Id.*, quoting *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994).

{¶40} The General Assembly has legislatively provided for the admission of tests used to determine alcohol levels based on the testing of blood, breath, or urine.

{¶41} R.C. 4511.19(D)(1)(b) pertinently states that "[i]n any criminal prosecution * * * for a violation of division (A) or (B) of this section * * *, the court may admit evidence on the concentration of alcohol * * * in the defendant's * * * breath * * * at the time of the alleged violation as shown by chemical analysis of the substance withdrawn within three hours of the time of the alleged violation." Further, the withdrawn breath "shall be analyzed in accordance with methods approved by the director of health by an individual possessing a valid permit issued by the director pursuant to section 3701.143 of the Revised Code." The General Assembly, then, has determined that a breath-test result is reliable evidence when the test complies with ODH regulations.

{¶42} "Administrative rules enacted pursuant to a specific grant of legislative authority are to be given the force and effect of law." *Doyle v. Ohio Bur. of Motor Vehicles*, 51 Ohio St.3d 46, 554 N.E.2d 97 (1990), paragraph one of the syllabus. Further, once the Director of Health has promulgated regulations for breath testing instruments, it must be presumed that the Director of Health acted upon adequate investigation. We must defer to the director's authority and may not substitute our judgment. *State v. Yoder*, 66 Ohio St.3d 515, 518, 613 N.E.2d 626 (1993). Ohio Adm.Code Sections 37-53-01 to 37-53-10 govern the proper procedures of the Intoxilyzer 8000.

{¶43} "After a defendant files a motion to suppress the admission of alcohol test results, 'the state has the burden to show that the test was administered in substantial

12

compliance with the regulations prescribed by the Director of Health.'" *Columbus v. Hutchison*, 10th Dist. Franklin No. 15AP-667, 2016-Ohio-3186, ¶ 28, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 24. "Substantial compliance creates a 'presumption of admissibility' that the defendant can only rebut 'by demonstrating that he was prejudiced by anything less than strict compliance' with the regulations." *Id.* at ¶ 28, quoting *Burnside* at ¶ 24.

{¶44} In his first assignment of error, Mr. Engler challenges his Intoxilyzer 8000 breath test result and the trial court's denial of his motion to suppress. Specifically, he argues ODHDAT (1) failed to remove the instrument when it received several "out of tolerance" messages; (2) failed to maintain service repair records; and (3) failed to use a dry gas standard traceable to the NIST. He also argues that the trial court impermissibly conducted its own research.

{¶45} We agree with the trial court that the state met its burden of showing substantial compliance and that Mr. Engler failed to demonstrate prejudice with either the specific test results or operational/maintenance issues regarding the specific machine. As our review of the trial court's factual findings demonstrated: Insp. Yanni testified that the machine was certified in working order; Mr. Marquis testified that "out of tolerance" means the machine should be on a watch list and replaced if it tests out of tolerance at some later date; there was one service record missing from the instrument issues log from March 21, 2018 when Insp. Yanni did an RFI check, but "that appeared to be the only record potentially missing regarding this machine;" and the dry gas standard was traceable to NIST. The trial court also separately researched the NIST issue and included

13

its research in the judgment entry, which we agree with Mr. Engler is impermissible, but in this case, not prejudicial.

{¶46} Pursuant to Ohio Adm.Code 3701-53-04, there was lengthy testimony from Mr. Marquis that a proper annual certification was done on the Eastlake Police Department's Intoxilyzer 8000 machine, which included a dry gas tolerance test, a wet bath simulator test, and an RFI check, and that the machine was certified in proper working order on February 26, 2018.

{¶47} Pursuant to Ohio Adm.Code 3701-53-04(G), results of instrument checks, controls, certifications, calibration checks, and records of service and repairs must be maintained for three years. The trial court found that one missing record does not show that ODHDAT did not substantially comply with the three-year specification of proper recordkeeping. The evidence affirmatively established that records were kept for at least three years, if not for the entire life of the instrument, and that the state introduced records indicating that this specific instrument was properly certified before Mr. Engler's test, and most importantly, that it was in proper working order when it performed his test.

{¶48} The record did not, however, affirmatively establish that a March 21, 2018 RFI check was missing an "instrument issues" record that should have been entered. Insp. Yanni testified that "if there was some problem with the machine * * * it's not documented," since nothing was reported on the issues log. The RFI check was documented in the COBRA data but did not have a corresponding entry in the issues log. He did not "remember going there for an RFI." The record is silent as to whether these types of RFI checks are routinely entered into the instrument issues log.

{¶49} As the Fifth District noted in *State v. Lentz*, 5th Dist. Delaware No. 09 CAC 07 0065, 2010-Ohio-762, "[w]e recognize that record keeping, including maintenance and repair records, is important so that defendants may conduct complete and relevant discovery concerning the instrument that was used to conduct their test. However, rigid compliance with the three-year specification in the ODH record-keeping regulation is not required where the records themselves are not shown to be misleading, inaccurate, or incomplete." *Id.* at ¶ 19.

{¶50} Mr. Engler also takes issue with the trial court's research on whether the dry gas traceability standards of NIST and NMI are equivalent. It is an abuse of discretion for a court to conduct its own investigation and consider its own observations as evidence in deciding a case. *See*, *e.g.*, *State v. Stanley*, 11th Dist. Portage No. 2007-P-0104, 2008-Ohio-3258, ¶ 28. Notwithstanding this prohibition and the trial court's outside research detailed in its entry denying the motion to suppress, the trial court's error was harmless because there was already evidence by way of testimony from ODH witnesses that the dry gas used had a traceability to NIST, pursuant to Ohio Adm.Code 3701-53-04(B). Specifically, Ms. Walock testified the Certificate of Analysis "provides an unbroken chain of traceability back to NIST standards." Insp. Yanni stated the .100 dry gas sample that was used for the certification showed that it was prepared using NIST standards and that it was also traceable to NMI standards.

{¶51} We find Mr. Engler's first assignment of error to be without merit because there is no evidence that the Intoxilzyer 8000 instrument at the Eastlake Police Department was not properly certified or not in working order at the time of Mr. Engler's

15

test.  The state met its burden of showing substantial compliance and Mr. Engler failed to demonstrate any prejudice.

{¶52}  Mr. Engler's first assignment of error is without merit.

## Maximum Sentence

{¶53}  In his second assignment of error, Mr. Engler argues that his sentence is contrary to law.  He specifically argues that the trial court erred in sentencing him to the maximum eight-year term of imprisonment for aggravated vehicular homicide because the trial court did not consider the purposes of sentencing pursuant to R.C. 2929.11 and failed to make the necessary maximum sentence findings pursuant to R.C. 2929.14(C).

{¶54}  We apply the standard of review for felony sentences, which is governed by R.C. 2953.08(G)(2).  *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 16.  Pursuant to R.C. 2953.08(G)(2):

{¶55}  "The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.

{¶56}  "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing.  The appellate court's standard of review is not whether the sentencing court abused its discretion.  The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:

{¶57}  "(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

16

{¶58} "(b) That the sentence is otherwise contrary to law."

{¶59} "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶60} As noted earlier, in *Jones*, *supra*, the Supreme Court of Ohio recently clarified that contrary to the "dicta" in *Marcum*, R.C. 29530.08(G)(2)(a) does not provide a basis for an appellate court to modify or vacate a sentence based on the lack of support in the record for the trial court's findings under R.C. 2929.11 and 2929.12. *Id.* at ¶ 29; *see Marcum* at ¶ 23. *See also State v. Patrick*, --- Ohio St.3d ---, 2020-Ohio-6803, --- N.E.3d ---, ¶ 67, fn. 2 (Donnelly, J., concurring) (the failure to observe the statutory requirements of R.C. 2929.11 and 2929.12 is not subject to appeal pursuant to R.C. 2953.08). Moreover, the *Jones* majority clarified that the term "otherwise contrary to law" under R.C. 2953.08(G)(2)(b) does not encompass an appellate court's conclusion that a sentence is not supported by the record under R.C. 2929.11 and R.C. 2929.12. *Id.* at paragraph two of the syllabus.

{¶61} Thus, our review of Mr. Engler's argument that the trial court erred in weighing the statutory factors of R.C. 2929.11 and 2929.12 is extremely limited.

### R.C. 2929.11 and R.C. 2929.12

{¶62} R.C. 2929.11 and R.C. 2929.12 apply as a general judicial guide for every sentencing. *State v. Foster*, 109 Ohio St. 1, 2006-Ohio-856, 845 N.E.2d 470, ¶ 36.

17

{¶63} R.C. 2929.11(A) states that the court "shall be guided by the overriding purposes of felony sentencing," which are "[1] to protect the public from future crime by the offender and others, [2] to punish the offender, and [3] to promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources."

{¶64} To "achieve those purposes," the court "shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." *Id.*

{¶65} R.C. 2929.12(A) grants the sentencing judge discretion "'to determine the most effective way to comply with the purposes and principles of sentencing.'" *Foster* at ¶ 37, quoting R.C. 2929.12(A). In exercising that discretion, the court shall consider, along with any other "'relevant'" factors, the seriousness factors set forth in divisions (B) and (C) and the recidivism factors in divisions (D) and (E) of R.C. 2929.12. *Id.*, quoting R.C. 2929.12(A). These statutory sections provide a nonexclusive list for the court to consider. *Id.*

{¶66} A violation of R.C. 2903.06(A)(1)(a), a second degree felony, carries a mandatory prison term of two, three, four, five, six, seven, or eight years. R.C. 2929.14(A)(2)(b).

{¶67} Mr. Engler's sentence is within the statutory range. Further, a review of the sentencing hearing and sentencing judgment entry reveals the trial court stated for the record that it considered the purposes and principles set forth in R.C. 2929.11 and the

seriousness/recidivism factors set forth in R.C. 2929.12. The trial court further discussed them at length under the specific circumstances of this case.

{¶68} Mr. Engler contends the trial court failed to acknowledge the third purpose of R.C. 2929.11(A), which is to "promote the effective rehabilitation of the offender using the minimum sanctions that the court determines accomplish those purposes without imposing an unnecessary burden on state or local government resources." Disagreement, however, with the trial court's application of the purposes and principles of sentencing to this case does not equate to his sentence being contrary to law or that the trial court did not consider it. The trial court possesses broad discretion to determine the most effective way to comply with the purposes and principles of sentencing within the statutory guidelines. *State v. Phifer*, 11th Dist. Trumbull No. 2020-T-0010, 2020-Ohio-4694, ¶ 52; R.C. 2929.12(A). The trial court satisfies its obligation to consider the statutory principles and factors by stating it considered them. *State v. Brown*, 11th Dist. Lake No. 2014-L-075, 2015-Ohio-2897, ¶ 34.

{¶69} As we noted above, the Supreme Court of Ohio's recent decision in *Jones* clarified that "although R.C. 2929.11 and 2929.12 are statutory sentencing requirements mandated by the General Assembly for every felony sentence, the failure to comply with those statutory sentencing requirements is not subject to appeal pursuant to R.C. 2953.08." *Patrick* at ¶ 67, fn. 2 (Donnelly, J., concurring); *see Jones* at ¶ 29. Even if the failure to comply with R.C. 2929.11 and 2929.12 were subject to appeal, there is no indication that the trial did not consider the statutory requirements. Further, Mr. Engler failed to demonstrate that the record does not support the trial court's findings or that the sentence is contrary to law.

**R.C. 2929.14(C)**

{¶70} Mr. Engler also argues that the trial court failed to make the required findings as outlined in R.C. 2929.14(C) when it imposed the maximum sentence for aggravated vehicular homicide.

{¶71} Mr. Engler's argument, however, fails to account for the changes in Ohio felony sentencing laws. We recently explained in *State v. Burrell*, 11th Dist. Portage Nos. 2020-P-0026, 2020-P-0027, & 2020-P-0028, 2020-Ohio-6685, that "[t]he statutory right to appeal a maximum sentence in R.C. 2953.08(A)(1) was enacted in 1995 at a time when findings were required for imposing the maximum term pursuant to former R.C. 2929.14(C). *See Foster* at ¶ 62-64. The findings requirement was found unconstitutional in *Foster* and subsequently removed from the statute in 2011 by Am.Sub.H.B. No. 86 while the language in R.C. 2953.08(A)(1) has never been amended. Admittedly, the statutory right to appeal a maximum sentence will seldom be vindicated given the court's discretion to impose such sentences and the absence of any requirement that the court make findings before doing so." *Id.* at ¶ 10.

{¶72} Thus, the trial court was not required to make factual findings per R.C. 2929.14(C).

{¶73} Mr. Engler failed to demonstrate that the trial court did not consider the statutory requirements or that the sentence is contrary to law.

{¶74} Mr. Engler's second assignment of error is without merit.

**Misdemeanor Sentencing**

{¶75} In his third assignment of error, Mr. Engler contends the trial court erred in sentencing him to a maximum sentence of 180-days for OVI because the trial court did

20

not consider the purposes of misdemeanor sentencing pursuant to RC. 2929.21 and the factors related to misdemeanor sentencing pursuant to R.C. 2929.22.

{¶76} "Misdemeanor sentencing is within the discretion of the trial court and a sentence will not be disturbed absent an abuse of discretion." *Conneaut v. Peaspanen*, 11th Dist. Ashtabula No. 2004-A-0053, 2005-Ohio-4658, ¶ 18. The term "abuse of discretion" is one of art, "connoting judgment exercised by a court, which does not comport with reason or the record." *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶ 30. An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶77} In fashioning an appropriate sentence in a misdemeanor case, the trial court must consider the factors set forth under R.C. 2929.22. *Conneaut v. Coleman*, 11th Dist. Ashtabula No. 2010-A-0062, 2011-Ohio-5099, ¶ 22. A trial court's failure to consider the R.C. 2929.22 factors amounts to an abuse of discretion. *State v. Rogers*, 11th Dist. Trumbull Nos. 2009-T-0051 & 2009-T-0052, 2010-Ohio-197, ¶ 11. Absent a showing otherwise, however, if the sentence lies within the statutory limit, a reviewing court will presume that the trial judge followed the standards required by the statute. *State v. Peppeard*, 11th Dist. Portage No. 2008-P-0058, 2009-Ohio-1648, ¶ 75.

{¶78} A silent record raises the presumption that the trial court considered all of the factors. *Id.* Further, there is no requirement that the court state on the record it considered the statutory sentencing criteria. *State v. Kish*, 11th Dist. Lake No. 2010-L-138, 2011-Ohio-4172, ¶ 8.

{¶79} Thus, the trial court is presumed to have considered the necessary factors, and there is nothing in the record to support Mr. Engler's contention that the trial court abused its discretion in imposing the maximum 6-month sentence for an OVI under R.C. 2929.24(A)(1), especially in this case, where a young woman's life was tragically cut short.

{¶80} Mr. Engler's third assignment of error is without merit.

{¶81} The judgments of the Lake County Court of Common Pleas are affirmed.


THOMAS R. WRIGHT, J.,

MATT LYNCH, J.,

concur.